IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

PEDRO ROSARIO

    **Plaintiff,**

               **v.**

LOOMIS PUERTO RICO,

    **Defendant.**

**Civil No.** 19-2095 (FAB)

**OPINION AND ORDER**

BESOSA, District Judge.

    Defendant Loomis Puerto Rico ("Loomis") moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"). (Docket No. 42.)  Plaintiff Pedro Rosario ("Rosario") also moves for summary judgment. (Docket No. 49.)  For the reasons set forth below, Loomis' motion for summary judgment is **GRANTED,** and Rosario's motion for summary judgment is **DENIED.** (Docket Nos. 42 and 49.)

**I.   Background[1]**

    This litigation pertains to alleged violations of the Americans with Disabilities Act ("ADA"), the Federal Age Discrimination in Employment Act ("ADEA"), and Title VII of the Civil Rights Act of 1964 ("Title VII").  Docket No. 1; <u>see</u> 42

---

[1] The Court has construed these facts in the light most favorable to Rosario in granting Loomis' cross-motion for summary judgment, and in the light most favorable to Loomis in denying Rosario's motion for summary judgment.

U.S.C. §§ 12101 *et seq.*, 29 U.S.C. §§ 621 *et seq.*, and 42 U.S.C. §§ 2000e *et seq.*  Rosario also invokes Puerto Rico Acts 80 and 100 regarding "employment discrimination and discharge without cause." Id.; see PR Laws Ann. tit. 29, §§ 146 and 185.

Loomis provides "services for distribution, storage and recycling of cash to financial institutions and commercial/retail businesses." (Docket No. 42 at p. 1.)  Rosario served as the branch manager for the Puerto Rico office from June 14, 2010 to the end of 2016. (Docket No. 49 at p. 9.)  As branch manager, Rosario was responsible for, *inter alia*, maintaining employee safety, training Loomis personnel, coordinating delivery routes, and responding to customer inquiries. (Docket No. 42, Ex. 6 at p. 1.)

In 2015, Loomis terminated the branch manager in Tampa, Florida. (Docket No. 49, Ex. 1 at p. 76.)  Rosario temporarily transferred to this office for five months to "help" Magdiel McKercher ("McKercher"), his supervisor and the district vice president for Puerto Rico and the United States Virgin Islands. Id.; Docket No. 42, Ex. 1 at p. 2.  According to Rosario, this transfer "was a very good experience." (Docket No. 49, Ex. 1 at p. 77.)  McKercher completed Rosario's annual review in 2015, noting that he "need[ed] to work on re-structuring Admin/Management staff, more involvement with [profit and

losses]," and "need[ed] to become an expert with financial tools"
(*i.e.* computer programs for accounts payable).   Id. at p. 83.
Rosario did, however, a "great job in restoring normalcy" to the
Tampa office.   Id. at p. 93; see Docket No. 42, Ex. 8 at p. 1.
McKercher subsequently requested that Rosario return to the Puerto
Rico office, confident that his subordinate "could be a [district
vice president] within 12 to 18 months."   Id. at p. 93.

In 2016, McKercher "asked [Rosario] if he wanted to take over
the Tampa branch."   Id. at p. 96.   Rosario accepted the offer, but
informed McKercher that he intended to undergo heart surgery on
December 16, 2016.   Id. at p. 97.   He thanked McKercher "for all
the time [he took] to make [Rosario] a better manager."   (Docket
No. 42, Ex. 12 at p. 2.)   Loomis supported Rosario during this
medical procedure, permitting him to recover from heart surgery
before the transfer to Tampa.   (Docket No. 49, Ex. 1 at p. 97.)
The CEO Of Loomis sent Rosario an e-mail, "wish[ing him] good luck
and speedy recovery." Id. at p. 132.   Indeed, the company continued
to pay Rosario a full salary during his medical leave of absence.
Id. at p. 108.   After Rosario relocated to Tampa, he traveled to
Puerto Rico for follow-up appointments with his physicians without
objection from Loomis.   Id. at p. 112.

Rosario's tenure as the Tampa branch manager began on
January 6, 2017.   (Docket No. 42, Ex. 11 at p. 1.)   An operations

manager subsequently reviewed the Tampa branch, observing that "some items from previous visits . . . still need[ed] attention." Id. at p. 122.  Violations of Loomis policies and procedures at Rosario's office included: (1) "[cash management services ("CMS")] and vault employees [were not] searched daily before leaving the building," (2) "uniforms in CMS did not meet company code," (3) cash couriers from other companies entered "the bay floor without a guard," (4) "lunch boxes were not searched," and (5) claims for loss of cash "need[ed] to be handled with urgency."  Id. at pp. 122-26.  McKercher informed Rosario that these issues were:

> operational – or basic operational items, the good thing
> is they're pretty easy to correct.  The bad is that these
> are common sense items that a supervisor like [Rosario's
> predecessor], with years of experience, should have seen
> and corrected a long time ago.  I appreciate all that
> you're doing to ensure a smooth operation, but you can't
> do it alone.  Make sure you're surrounding yourself with
> a competent management structure like you had in P.R.
> and this is the only way Tampa will be successful.

Id. at pp. 136-37.

The Tampa office continued to exhibit poor performance, however, including "a high number of missed routes."  Id. at p. 156. McKercher provided Rosario with a "staffing model" to address this concern, noting that:

> You [*i.e.* Rosario] showed that Tampa was overstaffed by
> almost eight employees, which was incorrect.  After we
> did the exercise to get it correctly [*sic*], Tampa was
> actually understaffed.  It should not take a report like
> this to tell you that you have a staffing issue as it
> should be evident by the route cancellations, long
> hours, *etc.*  You have now been retrained on this report
> and I believe the subsequent reports still show Tampa
> understaffed at the [cash in transit] level.  Please
> advise if you are in need of [assistance from another
> Loomis office] at this time as we should not be
> cancelling routes.

Id. at p. 157.  On two consecutive weekends in February 2018,
armored couriers from Rosario's office failed to retrieve cash
from SunCoast, a client with a "big account" at Loomis.  Id. at
pp. 280-311.  A SunCoast representative sent Rosario two e-mail
inquiries, but he responded only after the vice president of sales
urged him to do so.  Id. at p. 283.  McKercher then sent Rosario
an e-mail stating: "another example of your team not answering
timely."  Id. at p. 286.  Rosario offered to "look at the
situation," but McKercher observed that:

> There are many changes needed to be done, but what I'm
> questioning is why it continues to happen.  You are not
> a new leader, Pedro, which is why this is so
> disappointing to see.

Id. at p. 287.  During this timeframe, Rosario's performance waned
in other areas as well.  Id. at p. 295.  For example, he failed to
submit timesheets to payroll.  Id.  The finance department
inquired, "Pedro, what is going on with your payroll?  This is not
good.  You have missed punches dating back to [*sic*] week beginning

2/26.  You should be approving all this daily at the very worse have everything clean by the end of day Friday each week."  Id.

In January 2018, McKercher visited the Tampa office.  Id. at p. 159.  He conducted individual and group interviews to assess the management staff.  Id. at pp. 160-61.  Rosario believed that these meetings were "very unethical."  Id. at pp. 169-70.  Essentially, Rosario thought that individual meetings "crossed a line of making your branch manager losing leadership in front of other people."  Id. at p. 170.  Rosario's perception of McKercher deteriorated at this juncture.  He "was not comfortable with the way that [McKercher] spoke to him."  Id. at p. 174.  According to Rosario, McKercher "was driving [him] out of the [Tampa] branch and the company."  Id. at p. 177.  At his deposition, Rosario identified ten instances of alleged discrimination.

### A. Ten Alleged Acts of Discrimination

First, Rosario and McKercher applied for the same district vice president position in 2015.  Id. at pp. 177 and 191.  Loomis CEO Lars Blecko ("Blecko") awarded the position to McKercher.  Id. at p. 191.  Before the announcement, Blecko made a "courtesy call" to Rosario, explaining that McKercher "[knows] 85 percent of the market in Florida."  Id. at p. 193.  After this phone call, Rosario asked McKercher "why [he] wasn't selected."  Id. at p. 177.  McKercher allegedly pointed his left index finger

to his right hand, "meaning that he is white and [Rosario] is brown." Id. at pp. 181-82, 195. McKercher remained silent as he pointed to his hand. Id. at p. 195. He did, however, opine that Loomis denied Rosario's application because he "didn't have U.S. experience." Id. Rosario and McKercher discussed the possibility of the former transferring to Tampa to advance his career. Id.

Second, Rosario interrupted a meeting at the Orlando office by talking during a presentation by Loomis employee Josh Zawada ("Zawada"). Id. at p. 199. Zawada threw a "fluffy" stress ball in Rosario's direction to gain his attention. Id. at pp. 182 and 192. The ball did not, however, hit Rosario. Id. at p. 184. According to Rosario, Zawada was "very disrespectful." Id. Rosario concedes, however, that it was also "disrespectful" to speak during another person's presentation. Id. at p. 200. After this incident, Rosario requested that McKercher instruct Zawada to apologize. Id. at pp. 182-83. McKercher refused, stating that he "asked [Zawada] to throw" the stress ball. Id. at p. 183.

Third, McKercher met with Loomis employees at the Tampa office in January 2018. Id. at pp. 183 and 202. These meetings were "unethical" according to Rosario. Id. at p. 202. He "told [McKercher, his supervisor,] to desist [from meeting with individual employees at the Tampa office] and invite [him] to those meetings as well." Id.

Fourth, a Loomis employee informed Rosario that McKercher discussed his education and performance with personnel at the Miami office sometime between 2015 and 2018. Id. at pp. 185 and 204. Rosario speculates that McKercher "question[ed] why [Rosario] was even applying for a [district vice president] job." Id. at p. 185. But, he cannot recall the "exact words" used by McKercher. Id. at p. 205. Referring to Rosario in conversations with Loomis employees was, he argues, unethical and immoral. Id. at p. 185.

Fifth, McKercher held a meeting at the Tampa office to provide employees with an opportunity to "bring issues that they [had]" to his attention. Id. at p. 208. McKercher displayed "body language" in a meeting that "embarrass[ed] Rosario in front of everybody." Id. at p. 186. He pointed at Rosario as an employee identified as an issue at the Tampa office. Id. at p. 208. In Rosario's mind, McKercher was "trying to say, 'Why haven't you resolved [this issue]?' Why – why, why, why?'" Id. at p. 208. He "did not like the fact that [McKercher was] making this body language gesture in front of [his] employees." Id. at pp. 208-09. McKercher "did not say anything" as he pointed, but Rosario "felt that the body language that he was using was very disrespectful." Id. at p. 210. The pointing "happened [only] on one occasion." Id. at p. 209.

Sixth, Rosario "went to [a] gas station to [get] something to eat" after the meeting where McKercher pointed at him.  Id. at p. 211.  Rosario subsequently received a phone call from McKercher.  Id.  McKercher told Rosario: "[C]ome back to the branch.  I want to see you here now."  Id.  When Rosario returned to the office, he observed McKercher standing next to an ATM technician.  Id.  Surveillance footage showed that McKercher placed the phone call to Rosario "in front of the tech."  Id. at p. 212. Rosario asked McKercher, "what do you need from me?"  Id. at p. 213.  He cannot recall what McKercher said in response, only that McKercher "correct[ed]" him in front of the ATM technician during a "very tough moment."  Id.

Rosario then requested to speak with McKercher in private.  Id. at p. 214.  They relocated to a separate office. Id.  Rosario asked McKercher: "can you stop talking or going off like that in front of [the ATM technician]?"  Id.  McKercher said, "No. No."  Id.  Rosario insisted that McKercher "was embarrassing [him] in front of this guy."  Id.  McKercher ended this conversation by stating, "Well, I don't fucking care.  We're going over there."  Id.  Rosario claims that McKercher also said "he wanted to" either "bring," "take" or "kick" his "ass" as a derogatory phrase for "let's go over there."  Id.  They returned to the ATM technician to address work-related matters, where

McKercher "aggressively [corrected] Rosario." Id. at pp. 217 and
225. Rosario cannot recall if McKercher raised his voice or yelled
at him. Id. at p. 230. He obtained the surveillance footage of
this encounter, but did not report McKercher's "big show" to Loomis
management. Id. at pp. 219 and 229.

Seventh, Rosario, McKercher, and other Loomis employees
learned that the "newly appointed CEO" of Loomis "was from Spain."
Id. at p. 237. McKercher remarked that the CEO "is coming from
Spain and [doesn't] know anything about the United States." Id.
at p. 237.

Eighth, Rosario, McKercher, and a human resource
employee discussed the differences between the Puerto Rico and
Tampa offices during a meeting in 2017 or 2018. Id. at pp. 186
and 233. Rosario disagreed with McKercher regarding an issue at
work. Id. at p. 233. McKercher replied that "he [understood]"
because Rosario "is from an island." Id. at pp. 186 and 233.
Rosario perceived this statement as a "derogative term," a reason
"why [the Tampa] branch wasn't working well." Id. at pp. 186-87.
McKercher and Rosario are from Cuba and Puerto Rico, respectively.
Id. at pp. 233-43. Rosario did not request McKercher to explain
the island comment. Id. at p. 235.

Ninth, Rosario and McKercher discussed the former's
performance as the Tampa branch manager in 2017 or 2018. Id. at

p. 238.  According to Rosario, McKercher "was just slamming [him] with whatever he had under his book."  Id. at p. 238.  Rosario remembered that "2015 was tough."  Id. at p. 239.  McKercher responded: "You were an embarrassment in 2015."  Id.

Tenth, in 2018, McKercher and Rosario discussed "operational stuff and things [McKercher] wanted him to do."  Id. At some point during this exchange, McKercher stated to Rosario "[that he'll] be looking for a new job pretty soon."  Id. at pp. 187-88, 239.  Rosario interpreted this statement as a threat (in Spanish, an "*amenaza*").  Id. at p. 188.

McKercher asseverates that he never insulted Rosario, used profanity, or embarrassed him in front of other people. (Docket No. 42, Ex. 7 at pp. 13 and 15.)  Moreover, he denies directing Zawada to throw the stress ball at Rosario.  Id. at p. 14.  McKercher contends that Zawada "threw an object in [Rosario's] direction [merely] to catch his attention."  Id. at p. 14.

**B.   Rosario Does Not Have a Disability**

Rosario never requested an accommodation for a mental or physical disability from Loomis.  Id. at pp. 246-47.  By his own admission, Rosario does "not have a disability."  Id. at p. 248. In fact, no medical issues interfere with his ability to work. Id.   Rosario presumes, however, that "people think" he is disabled.  Id.

   **C.   Rosario's Resignation from Loomis**

        Rosario never received a formal disciplinary action from
Loomis, nor was he placed on a performance improvement plan.   Id.
at pp. 246-47.  He resigned from Loomis on March 28, 2018.  (Docket
No. 42, Ex. 11.)  His resignation letter stated, in pertinent part,
that:

>      [He] enjoyed working with Loomis immensely over the past
>      8 years . . . However, the time [had] come for [him] to
>      move on and pursue further personal and professional
>      career  goals.   [He]  therefore  [resigned]  from  [his
>      position]  effective  April 23, 2018.   This  letter
>      [served] as his two week [*sic*] notice.

Id.  Rosario had accepted a position at Brinks before he resigned
from Loomis.  (Docket No. 49, Ex. 1 at pp. 99-104 and 246.)  This
company is a Loomis competitor.  Id.  Three days after proffering
his  two-week  notice,  Rosario  informed  Loomis  that  "[his
resignation  was  effective]  last  Friday."   Id. at p. 318.  He
started at Brinks on April 2, 2019, before returning his Loomis
office keys and uniform.  Id. at pp. 319 and 323.

        The  Loomis  regional  director  of  human  resources
submitted an affidavit under penalty of perjury.  (Docket No. 42,
Ex. 11.)  According to this affidavit, Loomis replaced Rosario
with Neil Bacon ("Bacon"), a 46 year-old man (born in 1971).  Id.
at p. 1.  Rick Nelson served as the Tampa branch manager after
Bacon departed from this position.  Id.  He was born in 1974.  Id.
Rosario  asserts,  however,  the  Loomis  hired  Danielle  Harmon

("Harmon") as his replacement because "she was in charge of the branch when [he] turned in [his] uniform." (Docket No. 49, Ex. 1 at pp. 253-57.) Moreover, an employee who applied for the branch manager position, but was rejected, told Rosario that he believed Harmon "got the offer." Id. at p. 257. Harmon is a "white woman who looks to be in her mid-thirties." (Docket No. 49 at p. 26.)

### D.   Initiation of Litigation

Rosario commenced this action on November 17, 2019 against Loomis Puerto Rico and Loomis Armored US LLC. (Docket No. 1.) The complaint sets forth eight causes of action. Counts one and two are based on purported violations of the ADEA. Id. at pp. 13-14. He maintains that Loomis administered "disparate treatment and adverse employment actions . . . in whole or substantial part because of his age" (count one). The company also displayed a "reckless indifference to his federally protected right to be free from discrimination and retaliation based on age" (count two). Id. at p. 13. Disability discrimination is alleged in the third and fourth causes of action. Id. at pp. 14-15. These counts mirror the ADEA causes of action, replacing age with disability as the protected class. Id. The fifth and sixth causes of action posit that Loomis discriminated against Rosario "in whole or in substantial part because of his color, race and national origin." Id. at pp. 16-18. The remaining causes of action allege

that Loomis violated Puerto Rico anti-discrimination statues (counts seven and eight). Id. at p. 17-18. He seeks legal and equitable relief, including $1,000,000.00 in compensatory damages, reinstatement of employment at Loomis, and $195,939.08 in backpay. Id. at pp. 14-19.

Loomis and Rosario filed cross-motions for summary judgment on November 15, 2012, and November 22, 2021, respectively. (Docket Nos. 42 and 49.) The parties responded to the cross-motions for summary judgment. (Docket Nos. 49 and 54.)

## II. Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 provides that the Court shall grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it has the potential of determining the outcome of the litigation." Dunn v. Trs. of Bos. Univ., 761 F.3d 63, 68 (1st Cir. 2014) (internal citation omitted).

The role of summary judgment is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Tobin v. Fed. Exp. Corp., 775 F.3d 448, 450 (1st Cir. 2014) (internal citation omitted).

The party moving for summary judgment has the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact" with definite and competent evidence. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994). The movant must identify "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any'" which support its motion. Celotex, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).

Once a properly supported motion has been presented, the burden shifts to the nonmovant "to demonstrate that a trier of fact reasonably could find in [its] favor." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (internal citation omitted). "When the nonmovant bears the burden of proof on a particular issue, [he or] she [or it] can thwart summary judgment only by identifying competent evidence in the record sufficient to create a jury question." Tobin, 775 F.3d at 450-51. Courts draw all reasonable inferences from the record in the light most favorable to the nonmovant, but it disregards unsupported and conclusory allegations. McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014).

When parties file cross-motions for summary judgment, a court must "consider each motion separately, drawing all inferences in

favor of each non-moving party in turn." AJC Int'l, Inc. v. Triple-S Propiedad, 790 F.3d 1, 3 (1st Cir. 2015) (internal quotation marks and citation omitted). "Cross-motions for summary judgment do not alter the [Rule 56] standard, but instead simply 'require [the Court] to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.'" Wells Real Estate Inv. Tr. II, Inc. v. Chardón/Hato Rey P'ship, 615 F. 3d 45, 51 (1st Cir. 2010) (citation omitted).

## III. The Age Discrimination in Employment Act

Rosario allegedly suffered from age discrimination because Loomis hired a younger person after he resigned from the company. (Docket No. 49 at p. 26.)  The ADEA provides that:

> [it is unlawful] for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

29 U.S.C. § 623(a)(1). "In order to prevail in a lawsuit under the ADEA, the plaintiff's age must actually have played a role in the employer's decision-making process and have had a determinative or motivating influence on the outcome." Díaz-Figueroa v. Ricoh P.R., Inc., 661 F. Supp. 2d 140, 153 (D.P.R. 2009) (Pieras, J.) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000)); Hoffman v. Applicators Sales & Serv., Inc., 439 F.3d 9, 17 (1st Cir. 2006).

A plaintiff asserting an ADEA claim must prove, through direct or indirect evidence, that age was the "but-for" cause of the challenged action.  Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009).  When the plaintiff relies on only indirect evidence of discrimination, as here, the First Circuit Court of Appeals applies the familiar, three-stage, burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Del Valle-Santana v. Servicios Legales De P.R., Inc., 804 F.3d 127, 130 (1st Cir. 2015); see also Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 429-30 (1st Cir. 2000).

If a plaintiff establishes a *prima facie* claim pursuant to the ADEA, he creates a rebuttal presumption of discrimination. Hidalgo v. Overseas Condado Ins. Agencies, 120 F.3d 328, 334-35 (1st Cir. 1997).  To overcome this presumption, an employer must adduce a legitimate nondiscriminatory reason for the employment action. Hoffman, 439 F.3d at 17.  Finally, the plaintiff may prove that the employer's legitimate nondiscriminatory reason was a mere pretext for age discrimination.  Soto-Feliciano v. Villa Cofresí Hotels, Inc., 779 F.3d 19, 23 (1st Cir. 2015).

A *prima facie* case of age discrimination requires that a plaintiff demonstrate by a preponderance of the evidence that: (1) that he was at least forty years old at the time of the challenged action; (2) that his work met his employer's legitimate

expectations; (3) that his employer took adverse action against him; and (4) "either younger persons were retained in the same position upon [his] termination or the employer did treat age neutrally in taking the adverse action." Del Valle-Santana, 804 F.3d at 129-30.  Asserting a *prima facie* case is not an onerous burden.  See Currier v. United Techs. Corp., 393 F.3d 246, 254 (1st Cir. 2004) (citing Cruz-Ramos v. P.R. Sun Oil Co., 202 F.3d 381, 384 (1st Cir. 2000)).

Rosario contends that "he was constructively discharged" by Loomis.  (Docket No. 26.)  "Just as the ADEA bars an employer from dismissing an employee because of his age, so too it bars an employer from engaging in a calculated, age inspired effort to force an employee to quit." Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000).  Consequently, "[adverse] employment action, for purposes of the ADEA, includes actual or constructive discharge." Torrech-Hernández v. Gen. Elec. Co., 519 F.3d 41, 50 (1st Cir. 2008).  To raise a constructive discharge claim in violation of the ADEA, a plaintiff must establish that "the working conditions imposed by the employer had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign." Velázquez-Fernández v. NCE Foods, Inc., 476 F.3d 6, 12 (1st Cir. 2007) (quoting Suárez, 229 F.3d at 54)); P.A. State Police v. Suders, 542 U.S. 139, 141 (2004)

("Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes.").

The constructive discharge inquiry is objective. "[An] employee's subjective perceptions do not govern." Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 45 (1st Cir. 2003) (citing Marrero v. Goya of P.R., Inc., 304 F.3d 7, 28 (1st Cir. 2002) (holding that "constant harassment" resulted in a constructive discharge")). Places of employment are "rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." Díaz-Figueroa, 661 F. Supp. 2d at 152 (quoting Gu v. Bos. Police Dept., 312 F.3d 6, 14 (1st Cir. 2002)). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal citations and quotations omitted); see also Suárez, 229 F.3d at 54 (noting that "the ordinary slings and arrows that workers routinely encounter in a hard, cold world" are insufficient to cause a constructive discharge). To demonstrate severe or pervasive harassment, courts consider "the frequency of

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Ríos DaSilva v. One, Inc., 980 F. Supp. 2d 148, 161 (D.P.R. 2013) (Domínguez, J.) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

Rosario argues that he was "forced to resign," but offers no evidence in support of this proposition, much less evidence from which a reasonable jury may infer that he was "forced to resign" because of age discrimination.  According to Rosario, the following adverse actions equate to a hostile work environment: (1) Rosario "felt like [McKercher] was trying to drive him out of Loomis," (2) Rosario requested McKercher "to return him to Puerto Rico to his previous role of branch manager," (3) McKercher's individual meetings at the Tampa office "resulted in [Rosario] loosing [sic] leadership," (4) McKercher "wanted to run the Tampa branch," (5) McKercher required Rosario "to check and answer all e-mail in a timely manner, including on weekends," (6) the stress ball incident, (7) McKercher pointing his hand, (8) the island comment, (9) "disrespectful body language," (10) the "you'll be looking for another job soon" comment, (11) a "reprimand" for "not answering an email," and (12) McKercher stating that "[he didn't] fucking

care" after Rosario requested that he "not embarrass him in front of other people."  (Docket No. 49 at p. 14.)

At most, this evidence demonstrates a personal conflict between Rosario and McKercher, not pervasive and severe harassment.  More importantly, Rosario fails to explain a nexus between the purported harassment and his age.  Rosario alludes to "comments referring to [his] physical and mental attributes," but fails to specify the substance of these statements.  (Docket No. 49 at p. 26.)  That somebody pointed at Rosario and threw a stress ball in his direction does not, without more, amount to a hostile work environment based on age-related animus. See Noviello v. City of Bos., 398 F.3d 76, 92 (1st Cir. 2005) (holding that "rudeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim").  Discussing Rosario's education and performance with Loomis employees at the Miami office was "part of the ordinary tribulations of the workplace."  Rattigan v. González, 503 F. Supp. 2d 56, 78-81 (D.D.C. 2007) (holding that comments made outside the plaintiff's presence about "cutting his balls off," suggesting that he was "disloyal," and threatening a demotion did not constitute a hostile work environment). Requesting that Rosario answer e-mails in a timely manner is not harassment.  See Lee-Crespo, 213 F. Supp. 2d at 431 ("[W]orkers are expected to have thick skins.") (Laffitte, J.).  A supervisor

may meet with individual employees without violating the ADEA, regardless of whether the branch manager feels embarrassed by this "unethical" behavior.  See Suárez, 229 F.3d at 54 (holding that the ADEA does not ensure a workplace "free from the usual ebb and flow of power relations and inter-office politics").

Construing the facts in the light most favorable to Rosario, the Court holds that no reasonable jury may find that he has established a *prima facie* case of age discrimination based on any adverse employment action on account of his age.  Consequently, the Court **DENIES** Rosario's motion for summary judgment as to counts one and two, and **GRANTS** Loomis' motion for summary judgment as to these counts.

## IV.   **Title VII of the Civil Rights Act**

Rosario invokes Title VII of the Civil Rights Act because Loomis purportedly "discriminated [against him] on the basis of his national origin, race and color of skin."  (Docket No. 49 at p. 29.)  Pursuant to Title VII, an employer cannot "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Moreover, an employer cannot "limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment

opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." Id. § 2000e-2(a)(2).

The legislative purpose for Title VII is remedial. Congress enacted this statute "to assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race . . . or national origin." Alexander v. Gardner-Denver Co., 415 U.S. 36, 44 (1974); Franceschi v. U.S. Dep't of Veterans Affairs, 514 F.3d 81, 85 (1st Cir. 2008) ("Title VII is a vehicle through which an individual may seek recovery for employment discrimination on the grounds of race, color, religion, gender, or national origin.").

The Title VII causes of action are based on an alleged hostile work environment. (Docket No. 49 at p. 30.) McKercher's allegedly "discriminatory actions towards [Rosario purportedly] created an unbearable" atmosphere at work. Id. Title VII and the ADEA "apply the same standards for examining hostile work environment claims." Rodríguez-Torres v. Gov't Dev. Bank, 704 F. Supp. 2d 81, 100 (D.P.R. 2010) (Pieras, J.) (citing Terry v. Ashcroft, 336 F.3d 128, 147-48 (2d Cir. 2003)); see Vick v. Brennan, 172 F. Supp. 3d 285, 301 (D.D.C. 2016) ("Courts apply the same analysis when evaluating a hostile work environment claim under Title VII and the ADEA.") (citation and quotation omitted). Accordingly,

Rosario's claims arising pursuant to Title VII are meritless.  See _supra_ Part IV.

Title VII is "not a general code of civility" in the workplace.  Lee-Crespo, 231 F. Supp. 2d at 427.  Observing that Rosario is from an island, pointing to one's hand, and commenting that the CEO from Spain lacks knowledge of the United States market without further elaboration as to why a reasonable person in Rosario's position would be insulted by these actions, cannot substantiate the Title VII causes of action.  See Harris, 510 U.S. at 22 (holding that the "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII.") (citation and internal quotation omitted); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity.") (citation and quotation omitted); Vázquez-Bonilla v. United Union of Roofers Local 8, Case No. 08-101, 2010 U.S. Dist. LEXIS 24984, at *25 (E.D.N.Y. Mar. 16, 2010) (holding that "Mr. Cohen's single race-based comment that Plaintiff was a 'miserable Puerto Rican' cannot be categorized as sufficiently pervasive").

Because no reasonable jury may find that Loomis discriminated against Rosario on the basis of his national origin, race, or color

of skin, summary judgment as to the Title VII claims is **DENIED** as to Rosario, and **GRANTED** as to Loomis.

## V.   The Americans with Disabilities Act

Congress enacted the Americans with Disabilities Act in 1990 "to assure equality of opportunity, full participation, independent living, and economic self-sufficiency" for people with disabilities, recognizing that "society has tended to isolate and segregate" this demographic.  42 U.S.C. §§ 12101(1)(2)-(8).  This statute prohibits employers from "discriminat[ing against a qualified individual on the basis of a disability."  Id. § 12111(2).  To survive summary judgment, Rosario must establish that a reasonable jury may find by a preponderance of the evidence "that he has a disability within the meaning of the ADA."  Manicini v. City of Providence by and through Lombardi, 909 F.3d 32, 29 (1st Cir. 2018); see Ramos-Echevarría v. Pichis, Inc., 659 F.3d 182, 186 (1st Cir. 2011).  A disability is:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(1).  Rosario's ADA claim is doomed because he cannot satisfy this "*sine qua non* requirement of ADA protection."

Corujo-Martínez v. Triple-S, Inc., 519 F. Supp. 2d 201, 212 (D.P.R. 2007) (Delgado-Colón, J.).

During Rosario's deposition, he denied having an impairment that substantially limits a major life activity. (Docket No. 49, Ex. 1 at p. 248.)  Furthermore, Rosario sets forth no allegations that he had a record of having a disability.  Consequently, the dispositive inquiry in this action is whether Loomis regarded Rosario as having a disability pursuant to 42 U.S.C. section 12010(1)(C) ("Subsection C").  See Mancini v. City of Providence, 909 F.3d 32, 45 (1st Cir. 2018) (holding that the "regarded as" prong "remain[ed] open to [the plaintiff] despite his failure to make out a genuine issue of material fact with respect to his 'actual disability' and 'record of disability' claims").  The "regarded as" prong prohibits discrimination motivated by "myths, fears and stereotypes" associated with physical and mental disabilities.  Ruiz-Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 82 (1st Cir. 2008).

In Sutton v. United Air Lines, 527 U.S. 471 (1999), the Supreme Court held that an individual is "regarded as" disabled if "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more

major life activities." 527 U.S. at 489. The "major life activity" limitation in Subsection C "narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect." ADAAA, § 2(b)(4), Pub. L. No. 110-325, 122 Stat. 3553.

Congress explicitly abrogated Sutton by enacting the American with Disabilities Act Amendment Act in 2004. Id. § 2(b)(3). A plaintiff pursuing a Subsection C cause of action need only demonstrate the he or she "has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A); see Mancini, 909 F.3d at 45-46 (noting that "[it] is not necessary for the plaintiff to prove that the impairment limits or is perceived to limit a major life activity") (citation omitted).

The record is devoid of any allegation suggesting that Loomis regarded Rosario as having a disability. He merely "**thinks** that people believe he has a disability." (Docket No. 49 at p. 7) (emphasis added). Rosario "**believes** that, due to his open-heart surgery, he was perceived as having a disability by other employees of [Loomis], particularly Mr. McKercher." Id. at p. 16 (emphasis added). "More than conclusory allegations, improbable inferences,

and unsupported speculation is required to defeat summary judgment." Doe v. Trs. of Bos. Coll., 892 F.3d 67, 92-03 (1st Cir. 2018) (internal citation and quotation omitted). Accordingly, the Court disregards Rosario's subjective impressions, feelings, and beliefs. See Davric Me. Corp. v. Rancourt, 216 F.3d 143, 150 (1st Cir. 2000) (holding that summary judgment was proper because the district court refused to "accept the nonmovant's subjective characterizations of events"); Casanova v. Wyndham Grand Rio Mar Beach Resort & Spa, 205 F. Supp. 3d 220, 224-25 (D.P.R. 2016) (dismissing an ADA cause of action in part because "many of Plaintiff's opposing statements are plagued with her subjective interpretation of the facts") (Pérez-Giménez, J.); Bickerstaff v. Vassar Coll., 196 F.3d 435, 456 (2d Cir. 1999)(holding that the employee's "feelings and perceptions of being discriminated against are not evidence of discrimination.").

Not one allegation proffered by Rosario pertains to a mental or physical impairment. For instance, stating that Rosario is "from an island" is irrelevant to the "regarded as" theory of liability. Nothing in the record suggests the alleged mistreatment is a pretext for discrimination based on a perceived disability. Knowledge that Rosario underwent heart-surgery, without more, cannot sustain civil liability pursuant to the ADA. See Warshaw v. Concentra Health Servs., 719 F. Supp. 2d 484, 496 (E.D. Pa.

2010) ("Defendants correctly respond that . . . mere knowledge of plaintiff's [impairment] is insufficient to show that plaintiff was regarded as disabled."); Dube v. Tex. HHS Comm'n & Thomas M. Suehs, Case No. 11-354, 2012 U.S. Dist. LEXIS 87514, at *11-13 (W.D. Tex. June 25, 2012) (granting the defendant's motion for summary judgment because the plaintiff merely alleged that "her supervisor regarded her as disabled because [he] knew that she had facet arthrosis," holding that "[e]ven in light of the ADA amendments, Plaintiff fails to create a genuine issue of fact on whether she was 'regarded as' disabled").

Because Rosario presents no evidence raising a substantial question of material fact that Loomis regarded him as disabled, the Court must **GRANT** Loomis' motion for summary judgment as to counts three and four, and **DENY** Rosario's motion as to these counts. See Bailey v. Ga. Pacific Corp., 360 F.3d 1163, 1170 (1st Cir. 2002) ("Since Bailey adduces no evidence that his employer thought he was unfit for either a class or a broad range of jobs, his 'regarded as' claim on disability must fail."); Haslam v. MVM, Case No. 07-052, 2008 U.S. Dist. LEXIS 85520, at *22 (D. Me. Oct. 21, 2008) (granting summary judgment in an ADA action because "no one from [the plaintiff's employer] ever indicated that he or she thought plaintiff was physically incapable of performing his CSO

duties, or made comments of any sort to plaintiff regarding his physical or medical condition").

## VI.  The Puerto Rico Causes of Action

This Court possesses discretion in exercising supplemental jurisdiction and may decline to do so if "all claims over which it has original jurisdiction" are dismissed.  28 U.S.C. § 1367(c); see, e.g., Cruz-Caraballo v. Rodríguez, 113 F. Supp. 3d 484, 493 (D.P.R. 2015) ("With no valid federal-law claims against defendants remaining, the Court, having considered these factors, declines to retain supplemental jurisdiction.") (Besosa, J.).  In deciding whether to decline supplemental jurisdiction, courts consider several factors, including "fairness, judicial economy, convenience, and comity." Desjardins v. Willard, 777 F.3d 43, 45 (1st Cir. 2015).  Because the federal causes of action are dismissed, the Court declines to exercise supplement jurisdiction regarding Rosario's claims pursuant to Puerto Rico Acts 80 and 100.

## VII. Conclusion

For the reasons set forth above, Loomis' motion for summary judgment is **GRANTED,** (Docket No. 42), and Rosario's motion for summary judgment is **DENIED,** (Docket No. 49).  The causes of action arising pursuant to the ADEA, Title VII, and the ADA (counts one through six), are **DISMISSED WITH PREJUDICE.**  Rosario's Ninth Cause of Action for attorneys' fees pursuant to Federal Law, and for

prejudgment interest pursuant to Fed.R.Civ.P. 54 is **DISMISSED WITH**

**PREJUDICE.** Rosario's Seventh and Eighth Causes of Action pursuant

to Puerto Rico Law are **DISMISSED WITHOUT PREJUDICE.** Rosario

remains free to pursue whatever Puerto Rico causes of action he

deems appropriate in local court.

Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, August 18, 2022.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
SENIOR UNITED STATES DISTRICT JUDGE